1

2

3

4

5

6            UNITED STATES DISTRICT COURT

7            EASTERN DISTRICT OF CALIFORNIA

8

| | |
|---|---|
| DAVID ANTHONY RENDON,<br><br>                    Plaintiff,<br><br>     v.<br><br>FRESNO POLICE DEPARTMENT,<br>POLICE OFFICER MARCUS K.<br>TAFOYA, POLICE SGT. MIKE<br>MANFREDI, POLICE OFFICERS JOHN<br>DOES 1029 AND THE CITY OF<br>FRESNO,<br><br>                    Defendants. | 1:05-CV-00661 OWW/DLB<br><br>ORDER GRANTING IN PART DENYING<br>IN PART DEFENDANTS' MOTION FOR<br>SUMMARY JUDGMENT OR,<br>ALTERNATIVELY, SUMMARY<br>ADJUDICATION |
| GABRIEL RODRIGUEZ AND REBECCA<br>RODRIGUEZ,<br><br>                    Plaintiffs,<br><br>     v.<br><br>CITY OF FRESNO, MARCUS TAFOYA,<br>individually and as an officer<br>of the Fresno Police<br>Department; and DOES 1 through<br>50,<br><br>                    Defendants. | |

## 1.  INTRODUCTION

     Defendants City of Fresno and Marcus Tafoya ("Tafoya") move

for judgment on the pleadings, or alternatively, for summary

1

1   adjudication.  (Doc. 53, Motion for Summary Judgment, Filed June

2   9, 2006.)  Plaintiff David Anthony Rendon ("Plaintiff") opposes

3   the motion.  (Doc. 76, Plaintiff's Opposition, Filed July 10,

4   2006.)

5                  **2.  PROCEDURAL BACKGROUND**

6        Plaintiff filed his original complaint on May 20, 2005.

7   (05-CV-00661, Doc. 1., Complaint.)  Plaintiff filed a first

8   amended complaint ("FAC") on August 29, 2005.  (05-CV-00661, Doc.

9   29, FAC, Filed August 29, 2005.)  Defendants filed an answer to

10  Plaintiff's complaint on August 30, 2005.  (05-CV-01017, Doc. 8.,

11  Answer.)  On June 2, 2006 *Rendon v. City of Fresno, et al.,* 05-

12  CV-00661 was consolidated with *Rodriguez v. City of Fresno, et*

13  *al.,* 05-CV-01017 for trial purposes.  (05-CV-00661, Doc. 50,

14  Order Consolidating, Filed June 2, 2006.)

15       Defendants filed a Motion for Summary Judgment, in the

16  alternative a Motion for Summary Adjudication against the

17  Plaintiff.  (05-CV-00661, Doc. 53, Motion for Summary Judgment,

18  in the alternative, Summary Adjudication, Filed July 9, 2006.)

19  On July 10, 2006, Plaintiff opposed the motion.  (05-CV-00661,

20  Doc. 76, Plaintiff's Opposition.)  On July 17, 2006, Defendants

21  filed a reply to Plaintiff's opposition.  (05-CV-00661, Doc. 86,

22  Defendants' Reply.)

23                 **3.FACTUAL BACKGROUND**

24

25  **A.    Confrontation at the Party**

26       **i.    Undisputed Facts**

27       On March 5, 2005, a party took place at the Rendon residence

28  at 4519 E. Mono Ave., Fresno, California (hereinafter "the

**2**

residence"). (DSUF, No. 1.) The stated purpose of the party was
to celebrate the return of George Rendon, brother of Plaintiff.
(DSUF, No. 2.) George Rendon is a United States Marine who
safely returned from the War in Iraq. (Doc. 82, Declaration of
David A. Rendon, Filed July 12, 2006), Exhibit A, Deposition of
David A. Rendon, ("Plaintiff's Depo."), 165:9-12.) The party
started at approximately 6:00 p.m. (DSUF, No. 3.) There were
approximately 50 persons attending the party and approximately 15
of them were children. (DSUF, No. 4.) During the party a
confrontation took place in front of the Rendon residence between
two men, Chris Martinez ("Martinez") and Rudy Escobar
("Escobar"). (DSUF, No. 5.) During this confrontation, Martinez
punched Escobar in the face. (DSUF, No. 6.) A crowd of
approximately 15-20 persons gathered in the front yard. (DSUF,
No. 7.) Plaintiff's father, David J. Rendon, told everyone to
"go home." (DSUF, No. 8.)

After the confrontation between Martinez and Escobar, Ralph
Rendon, Plaintiff's brother, came out of the house and had to be
restrained from assaulting Rudy Escobar. (DSUF, No. 9.)
Plaintiff described Ralph Rendon as having had "too much to
drink" that evening. (DSUF, No. 10.) Plaintiff's brother,
Lawrence Rendon also had to restrain Ralph Rendon. (DSUF, No.
11.) At this point, a "mob of people" had gathered in the front
yard area, and people were shouting to the point where Plaintiff
"couldn't hear anything." (DSUF, No. 12.) The crowd in the
front yard started pushing against each other, to the point where
people started falling. (DSUF, No. 13.) Plaintiff's father
started spraying the crowd with a water hose. (DSUF, No. 14.)

**3**

1  Plaintiff's clothing became wet and muddy.  (DSUF, No. 16.)  At

2  this point Plaintiff's siblings Lawrence Rendon, George Rendon,

3  and Lupe Martinez were with Ralph Rendon.  (DSUF, No. 19.)

4              **ii.  Disputed Facts**

5       Plaintiff asserts that the confrontation between Martinez

6  and Escobar took place before the police arrived.  (Plaintiff's

7  Depo., 175:18 - 177:17; Doc. 82, Declaration of David A. Rendon,

8  Filed July 12, 2006, Exhibit C, Deposition of Eloy Escareno,

9  23:5-21).  Plaintiff further asserts that the confrontation was

10 over and that Martinez had apologized to Escobar by the time

11 Plaintiff's father told everyone to "go home."  (Plaintiff's

12 Depo., 181:13 - 182:3; 213:15-214:9)

13      Defendants claim that the confrontation caused the crowd  in

14 the front yard to start pushing and, as a result, Plaintiff fell

15 down with his cousin, Gennero Vega, on top of him.  (DSUF, No.

16 15.)  Plaintiff disputes this statement and also raises an

17 objection as "out of order."  When Plaintiff got up off the

18 ground, Gennero Vega held on to him and said, "don't fight."

19 (DSUF, No. 17.)  Plaintiff claims that he did not see anybody

20 fighting and said, "What is he talking about?"  (Plaintiff's

21 Depo., 197:15-200:11; Generro Vega Depo., 66:1-63:23).

22 Defendants claim that after Plaintiff got up off the ground, the

23 crowd was "really, really loud, yelling 'Ralph calm down. Ralph

24 calm down.'"  (DSUF, No. 18.)  Plaintiff, however, asserts that

25 the yelling came from several women who were wet from his

26 father's water hose and, as a result, were yelling "Ralph calm

27 down. Ralph calm down."  (Plaintiff's Depo., 199:15-206:21)

28 Defendants claim that Plaintiff began to go over to the crowd to

                              **4**

1  "start breaking people up." (DSUF, No. 20.)  Plaintiff claims

2  that upon trying to start to break  people up he said "What's

3  going on?" and "What are you guys doing?" because no one was

4  fighting. (Plaintiff's Depo., 206:9-208:2.)

5       **B.   Arrival of the Police**

6            **i.   Undisputed Facts**

7       At approximately midnight on March 5, 2005, Sgt. Michael

8  Manfredi ("Manfredi") and Officer Marcus Tafoya ("Tafoya")

9  received a disturbance call concerning a fight described as

10  involving 50 people at the residence. (DSUF, No. 21.)  Manfredi

11  and Tafoya were approximately a block away from the residence

12  when the disturbance call came in.  (DSUF, No. 22.)  Manfredi and

13  Tafoya responded to the disturbance call at the residence within

14  seconds, and were the first police officers to arrive. (DSUF,

15  No. 23.)  Plaintiff's wife informed him that the police were

16  coming to the residence. (DSUF, No. 24.)  Plaintiff formed the

17  impression that the police were coming to the house because of

18  the loud noise. (DSUF, No. 25.)

19       When the police officers arrived at the residence,

20  approximately 30 persons were still at the party. (DSUF, No.

21  26.) There were also approximately 20-25 persons outside of the

22  house in the front yard. (DSUF, No. 27.)  When Manfredi and

23  Tafoya arrived at the scene, the overhead lights and siren on

24  their patrol vehicle were activated but the siren was deactivated

25  once the patrol car stopped. (DSUF, No. 28.)

26       Manfredi saw a "big disturbance" in the front yard with

27  approximately 20-25 persons fighting in the yard and the porch.

28  (DSUF, No. 31.)  There were lawn chairs and beer bottles being

**5**

thrown across the yard. (*Id.*)  Manfredi saw persons running away from the house, as well as running toward the house. (DSUF, No. 32.)  Manfredi saw that the disturbance seemed to be primarily at the front door to the residence. (DSUF, No. 33.)  He saw several persons including females and an older male, on the front porch. (*Id.*)  These females and older males appeared to be trying to keep one group of people from coming into the house while appearing to get others into the house at the same time.  (*Id.*) Officer Escareno saw the disturbance from approximately 10-15 feet behind Manfredi and Tafoya, and observed ladies crying and yelling in the front of the residence. (Escareno Depo, 25:1923; 31:20-24.)

### ii.  Disputed Facts

Plaintiff claims that once the police arrived, he entered the residence with his wife so that he could put on a shirt and "clean up" to be presentable to talk to the officers. (Plaintiff's Depo., 208:3-210:21; 211:11-21; Claudia Rendon Deposition, 60:5-61:9.)  Defendant asserts that as Manfredi and Tafoya exited the patrol vehicle, Manfredi placed a Code 3 call from his lapel microphone because of the size of the disturbance. Plaintiff disputes this fact.  (DSUF, No. 30.)

Manfredi considered the possibility that a gang was trying to crash the party because the area was dominated by the "Bulldogs," a local gang.  (DSUF, No. 34.)  According to Plaintiff, Manfredi stated that he had no reason to believe that the people he was dealing with were "Gang Related", or that it was a "Gang Party."  (Manfredi Depo, 41:12-23).

**6**

After Manfredi exited the patrol vehicle, his main concern was for the people at the front door, who looked like they were trying to protect the front of the house.  (DSUF No., 35.) Plaintiff also disputes this fact and the fact that Manfredi considered the circumstances he was facing.  (DSUF, No. 36.) According to Plaintiff, Officer Escareno did not see any immediate threat upon arriving.  (Escareno Depo., 59:1-4; 58:4-8.)

**C.   Disputed Facts As To Incidents Outside the Residence**

Manfredi and Tafoya made their way up to the front porch of the residence, advising, "Police, stop fighting."  (DSUF, No. 37.)  As Manfredi approached the porch, he pulled people apart who were fighting, and tried to get them away from the residence. (DSUF, No. 38.)  Manfredi also noticed approximately twelve persons fighting on the front porch, including several females and an older male.  (DSUF, No. 39.)

Manfredi stepped up onto the stairs on the left side of the front porch, with Tafoya several feet away on his right.  (DSUF, No. 40.)  On the front porch, Lawrence and Ralph Rendon appeared on the left side of the porch and George Rendon was on the right side of the porch.  (DSUF, No. 41.)  Manfredi separated Lawrence Rendon and an unknown male, who were locked in a struggle on the porch.  (DSUF, No. 42.)  Once Manfredi separated two other unknown males, Plaintiff's brother Lawrence Rendon came from one side and hit Manfredi on the back of the head and left shoulder. (DSUF, No. 43.)  After Manfredi was struck by Lawrence Rendon, Ralph Rendon looked at Manfredi's badge and medals, and punched him two times in the right temple and the cheek.  (DSUF, No. 44.)

**7**

1    At this point, Lawrence, Ralph, and George Rendon pushed Manfredi
2    backward off the porch.  Manfredi landed on his back, with his
3    head and neck striking both the concrete and the grass.  (DSUF,
4    No. 45.)  After falling to the ground, Ralph, Lawrence and George
5    Rendon, as well as others were on top of Manfredi, and he was
6    unable to move because of the weight of people on top of him.
7    (DSUF, No. 46.)  Defendants claim that while Manfredi was on the
8    ground, he was stuck by the individuals who were on top of him.
9    (DSUF, No. 47.)  Manfredi also felt his gun being lifted out of
10   his holster and yelled to Tafoya that somebody was "trying to get
11   my gun."  (DSUF, No. 48.)  Tafoya started pulling subjects off
12   Manfredi.  (DSUF, No. 49.)  Manfredi grabbed the hand of the
13   person who was lifting his gun, who was Ralph Rendon.  (DSUF, No.
14   50.)

15       Plaintiff provides a different account of what occurred.
16   Plaintiff asserts that Officer Escareno testified he "did not"
17   observe any individuals engaged in a fight.  (Escareno Depo.,
18   23:5-9.)  Claudia Rendon observed Lawrence Rendon inside the
19   living room standing next to the bookcase.  (Claudia Rendon
20   Depo., 61:7-18.)  Plaintiff asserts that Officer Escareno
21   testified he did not see or otherwise observe any individuals at
22   the residence, hit or kick Manfredi or Tafoya.  (Escareno Depo.,
23   23:16-21; 31:20-32:19; 36:24-37:4; Claudio Rendon Depo., 61:10-
24   67:7.)  Plaintiff further claims that Claudia Rendon witnessed
25   Tafoya enter the home and then strike Lawrence Rendon with his
26   baton.  (*Id.*)  According to Plaintiff, Officer Escareno observed
27   Manfredi fall out of the crowd with Ralph Rendon and that he fell
28   on top of "the Hispanic male."  (Escareno Depo., 36:24-37:4;

**8**

31:20-32:19; Tafoya Depo., 100:18-24.)   Contrary to Defendants'
accounts, Plaintiff claims that Manfredi then straddled "the
unknown Hispanic male" who was not resisting him or the other
Defendants. (Escareno Depo., 36:24-37:4; 31:20-32:19; 2317-21;
58:4-8; 59:1-4; 66:6-13.)   Officer Escareno stood approximately
two feet behind Manfredi and provided cover to his backside,
while Manfredi pointed his gun at a non-resisting Ralph Rendon.
(Escareno Depo., 36:24-37:4; 31:20-32:19; 23:17-21; 58:4-8; 59:1-
4; 66:6-13.)   At no time during this event did Officer Escareno
feel threatened or witness any officer being assaulted by the
people who were outside the residence during this time.   (*Id.*)
Plaintiff claims that Officer Escareno and Tafoya never witnessed
Ralph Rendon at any time trying to take Manfredi's gun.
(Escareno Depo., 42:14-23; 43:24-44:5; 46:2-47:23, 50:18-51:9.)
Plaintiff claims that Officer Escareno never observed Plaintiff
attempt to commit the act of resistance, by being combative, or
make an attempt to grab for the gun. (Escareno Depo, 50:18-51:9;
Tafoya Depo 100:18-24.)

Defendants claim that during this altercation Manfredi and
Tafoya heard sirens. (DSUF, No. 51.)   Tafoya heard an individual
yell out "leave my family alone." (DSUF, No. 52.)   Tafoya then
directed his attention toward the direction of where he heard
this and that Plaintiff struck him in the face with a closed
fist. (DSUF, No. 53.)   Officer Tafoya observed Plaintiff flee
inside the Rendon residence. (DSUF, No. 54.)   Next, Tafoya
directed his attention toward Lawrence Rendon, who was standing
on the front porch. (DSUF, No. 55.) Defendants' assert that
Lawrence Rendon lunged over people and struck Tafoya on top of

**9**

his head with his left fist.  (DSUF, No. 56.)  Tafoya executed
one or more forward strikes at Lawrence Rendon with his
expandable baton in an attempt to keep from being hit again.
(DSUF, No. 57.)  After Lawrence Rendon was struck with the baton,
he fled toward the inside of the residence.  (DSUF, No. 58.)  At
this point, Tafoya began to be pushed and shoved toward the front
door of the residence by a large group of unknown persons.
(DSUF, No. 59.)  Tafoya tried to get out of the way of this
group, but was unable to do so, and was pushed inside of the
residence.  (DSUF, No. 60.)

　　　Plaintiff disputes Defendants' factual allegations by
stating that he never encountered or assaulted Tafoya outside the
residence that night.  (Escareno Depo., 31:25-32:7; 32:25-33:9.)
Further, Officer Escareno did not see or otherwise observe any
individuals at the Rendon residence, hit or kick Manfredi or
Tafoya.  (*Id.*)  Claudia Rendon stated that she and Plaintiff
entered the home before the police arrived.  (Claudia Rendon
Depo., 57:12-21; 58:18-21.)  Plaintiff claims that Officer
Escareno approached the Rendon residence at different intervals
while he maintained a constant view of Defendants Manfredi and
Tafoya and that he never witnessed or observed individuals
outside the residence being combative, hitting, kicking, or
otherwise formed the impression that any individuals threatened
him or the Defendants.  (Escareno Depo., 31:20-32:7; 32:25-33:9.)
Rather than being pushed inside the house, Plaintiff claims that
Tafoya quickly walked inside the residence swinging his baton,
and he seemed upset, angry and hostile.  (Claudia Rendon Depo.,
61:7-18.)

**10**

**D.    Disputed Facts As To Incidents Inside The Residence**

Defendants claim that while Tafoya was inside the residence he was to be struck by unknown subjects in different locations. (DSUF, No. 61.)  At this point, Tafoya was "scared to death." (DSUF, No. 62.)  Plaintiff's father locked the security door when Officer Tafoya was inside of the residence.  (DSUF, No. 63.) Tafoya noticed that the front door was shut.   (DSUF, No. 64.) Tafoya advised over his lapel microphone that he needed Code 3 assistance inside of the residence.  (DSUF, No. 65.)  Tafoya then saw persons identified as Plaintiff and Lawrence Rendon, and advised them that they were in custody and to get on the ground. (DSUF, No. 66.)  At different intervals, Tafoya was attacked physically and verbally inside of the residence by several persons, including David J. Rendon, Gabriel Rodriguez, Rebecca Rodriguez, and John Nunez.  (DSUF, No. 67.)  While Officer Tafoya was in the residence, several officers arrived at the scene, including Officer Escareno.  (DSUF, No. 68.)

Plaintiff claims that at no point in time was Tafoya physically attacked or pushed by any individuals inside the house.  (Claudia Rendon Depo., 69:20-70:4; 75:20-76:1.)  There was no threat to Tafoya or any other police officer present at the scene.  (*Id.*)  Instead, Plaintiff claims that people inside the house were fearful of Tafoya and that people were crying out for help because Tafoya was out of control.  (Escareno Depo., 99:16-25, 100:8-17; Claudia Rendon Depo., 74:1-13.; 75:22-76:1.)

Plaintiff claims that David J. Rendon walked inside the residence as Tafoya struck Gabriel Rodriguez, and yelled "Stop. What are you doing? What are you doing to my family?"

**11**

1   (Plaintiff's Depo., 269:15-24; 270:3-8.)  David J. Rendon then

2   locked the screen door.  (*Id.*)  Plaintiff, without providing any

3   support, claims that at no time was the front door shut and that

4   only the security door was shut.  Plaintiff claims Tafoya walked

5   inside the house, struck Lawrence Rendon, then gave a command

6   "get down."  He then proceeded to strike Gabriel and Rebecca

7   Rodriguez in a violent manner, with his expandable baton, then

8   gave a general command that "everybody get down."  (Claudia

9   Rendon Depo., 61:7-18.)  Plaintiff claims that at no point in

10  time while inside the house was Tafoya physically attacked or was

11  his life in danger.  (Escareno Depo., 197:21-197:1-11.)

12      Manfredi was concerned for Tafoya's safety, and instructed

13  Officer Escareno to find him.  (DSUF, No. 69.)  Officer Escareno

14  and Officer Ryan Stockdale ("Officer Stockdale") came up to the

15  security door and requested entry.  (DSUF, No.70.)  Plaintiff's

16  father opened the security door and allowed entry to officers

17  Stockdale and Escareno.  (DSUF, No. 71.)  Officer Escareno

18  approached Tafoya, and helped him place John Nunez and another

19  male subject in custody.  (DSUF, No. 72.)  Tafoya started walking

20  toward the front door, and then directed officers to arrest

21  Gabriel and Rebecca Rodriguez.  (DSUF, No. 73.)  Outside of the

22  residence, Manfredi eventually took control of Ralph Rendon, and

23  handed him to Officer Marshall Chun.  (DSUF, No. 74.)  Manfredi

24  then entered the residence through the front door, and took

25  Lawrence Rendon into custody.  (DSUF, No. 75.)  Manfredi then

26  authorized a protective sweep of the residence.  (DSUF, No. 76.)

27      Plaintiff disputes Defendants' account.  According to

28  Plaintiff, upon Officer Escareno's arrival on the scene, he

**12**

1   observed Manfredi and Tafoya running up to the crowd.  (Escareno

2   Depo., 10:5-11; 10:6-13.)  Officer Escareno was concerned that he

3   did not see Tafoya.  (Escareno Depo., 66:20-67:1-10.)  Plaintiff

4   claims that only Officer Escareno came up to the security door at

5   the front of the residence and requested entry.  (Escareno Depo.,

6   70:21-71:25;. 72:1.)  Plaintiff, further, claims that, once

7   inside, Officer Escareno approached Tafoya in the back family

8   room and asked him to exit the residence, as he had witnessed

9   people were fearful of and upset by Tafoya's presence.  (Escareno

10  Depo., 99:3-100:8-20.)

11      According to Plaintiff, Tafoya escorted Gabriel Rodriguez

12  outside of the residence after attacking him, Rebecca Rodriguez,

13  and Lawrence Rendon.  (Escareno Depo., 103:22-104:1-11; 107:10-

14  20.)  Plaintiff also claims that an officer soon returned and

15  started walking to the front door into the house.  (*Id.*)  It is

16  unclear whether Plaintiff is referring to Tafoya.  (*Id.*)

17  Plaintiff claims that this officer stopped and assaulted another

18  individual by kicking him.  (*Id.*)  With the help of another

19  officer they took the individual down to the ground to arrest

20  him.  This individual was not combative, struggling, or fighting

21  back.  (*Id.*)  Finally, Plaintiff claims that Manfredi struck

22  Ralph Rendon with the end of his revolver, while the suspect was

23  on the ground, handcuffed behind his back and that Manfredi has a

24  history of using excessive and unnecessary force.  (Escareno

25  Depo., 160:2-13, 161:22-162;1-11.)

26  //

27  //

28  //

**13**

**E.   Plaintiff's Arrest.**

**i.   Undisputed Facts**

Eventually, Plaintiff was asked by a police officer to stand up, and he was escorted out of the house without handcuffs, or any sort of control hold.  (DSUF, No. 77.)  Outside of the residence, Plaintiff was handcuffed by a female officer.  (DSUF, No. 78.)  Other than checking for tattoos, Plaintiff did not receive any treatment from this officer that he found objectionable.  (DSUF, No. 79.)  Plaintiff was then placed in a patrol vehicle without incident.  (DSUF, No. 80.)

**ii.  Disputed Fact**

Manfredi and Tafoya prepared their police reports independently, and did not conspire to falsify their police reports.  (DSUF, No. 81.)  However, Plaintiff claims that Officer Escareno had a conversation with Tafoya later that evening regarding Anaya writing an original report about the incidents of March 6, 2005 of which she had not been a witness and had "came after the fact."  (Escareno Depo., 205:21-206:11.)

**F.   Lack of Government Claim Filing**

Plaintiff never filed a claim for damages as required by the California Government Code with the City of Fresno.  (DSUF, No. 82.)

**4.   LEGAL BACKGROUND**

**A.   Summary Judgment Standard**

Summary judgment is warranted only "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact."  Fed. R. Civ. P. 56©;

**14**

1  *California v. Campbell*, 138 F.3d 772, 780 (9th Cir. 1998).

2  Therefore, to defeat a motion for summary judgment, the non-

3  moving party must show (1) that a genuine factual issue exists

4  and (2) that this factual issue is material. *Id.*  A genuine

5  issue of fact exists when the non-moving party produces evidence

6  on which a reasonable trier of fact could find in its favor

7  viewing the record as a whole in light of the evidentiary burden

8  the law places on that party. *See Triton Energy Corp. v. Square*

9  *D Co.*, 68 F.3d 1216, 1221 (9th Cir. 1995); *see also Anderson v.*

10  *Liberty Lobby, Inc.*, 477 U.S. 242, 252-56 (1986).  Facts are

11  "material" if they "might affect the outcome of the suit under

12  the governing law." *Campbell*, 138 F.3d at 782 (quoting *Anderson*,

13  477 U.S. at 248).

14      The nonmoving party cannot simply rest on its allegations

15  without any significant probative evidence tending to support the

16  complaint. *Devereaux v. Abbey*, 263 F.3d 1070, 1076 (9th Cir.

17  2001).

18              [T]he plain language of Rule 56© mandates the
            entry of summary judgment, after adequate time
19          for discovery and upon motion, against a party
            who fails to make a showing sufficient to
20          establish the existence of an element essential
            to the party's case, and on which that party
21          will bear the burden of proof at trial.  In such
            a situation, there can be "no genuine issue as
22          to any material fact," since a complete failure
            of proof concerning an essential element of the
23          nonmoving party's case necessarily renders all
            other facts immaterial.

24

25  *Celotex Corp. v. Catrell*, 477 U.S. 317, 322-23 (1986).  The more

26  implausible the claim or defense asserted by the nonmoving party,

27  the more persuasive its evidence must be to avoid summary

28  judgment. *See United States ex rel.  Anderson v. N. Telecom,*

**15**

*Inc.*, 52 F.3d 810, 815 (9th Cir. 1996).  Nevertheless, the evidence must be viewed in a light most favorable to the nonmoving party.  *Anderson*, 477 U.S. at 255.  A court's role on summary judgment is not to weigh evidence or resolve issues; rather, it is to determine whether there is a genuine issue for trial.  *See Abdul-Jabbar v. G.M. Corp.*, 85 F.3d 407, 410 (9th Cir. 1996).

### B.   Summary Judgment in a Qualified Immunity Case

In this case, Defendants assert the defense of qualified immunity on behalf of all the individual defendants.  Deciding qualified immunity entails a two-step analysis.  First, a court must ask whether a constitutional violation occurred at all.  If the answer to this question is yes, the court must then inquire whether the right violated was "clearly established" by asking whether a reasonable officer could believe that the defendant's actions were lawful.  *See Saucier v. Katz*, 533 U.S. 194, 201 (2001).

The traditional summary judgment approach should be used in analyzing the first step of the *Saucier* analysis:

> A court required to rule upon the qualified immunity issue must consider, then, this threshold question: Taken in the light most favorable to the party asserting the injury, do the facts alleged show the officer's conduct violated a constitutional right? Where the facts are disputed, their resolution and determinations of credibility are manifestly the province of a jury.

*Wall v. County of Orange*, 364 F.3d 1107, 1110-1111 (9th Cir. 2004) (internal citations and quotations omitted).  In the second step, the court must ask whether it would be clear to a reasonable officer that his conduct was unlawful in the situation

**16**

confronted.  Although this inquiry is primarily a legal one,
where the reasonableness of the officer's belief that his conduct
was lawful "depends on the resolution of disputed issues of
fact...summary judgment is not appropriate." *Wilkins v. City of*
*Oakland*, 364 F.3d 949, 1110-11 (9th. Cir. 2003) (citing *Saucier*,
533 U.S. at 216 (Ginsburg J., concurring)).

### C.   Civil Rights Claims Under 42 U.S.C. section 1983

"Section 1983 provides for liability against any person
acting under color of law who deprives another 'of any rights,
privileges, or immunities secured by the Constitution and laws'
of the United States." *S. Cal. Gas Co. v. City of Santa Ana*, 336
F.3d 885, 887 (9th Cir. 2003)(quoting 42 U.S.C. § 1983).  "The
rights guaranteed by section 1983 are 'liberally and beneficently
construed.'" *Id.* (quoting *Dennis v. Higgins*, 498 U.S. 439, 443
(1991).  Pursuant to 42 U.S.C. § 1983, Plaintiff may bring a
civil action for deprivation of rights under the following
circumstances:

> Every person who, under color of any statute,
> ordinance, regulation, custom, or usage, of any State
> or Territory or the District of Columbia, subjects,
> or causes to be subjected, any citizen of the United
> States or other person within the jurisdiction
> thereof to the deprivation of any rights, privileges,
> or immunities secured by the Constitution and laws,
> shall be liable to the party injured in an action at
> law, suit in equity, or other proper proceeding for
> redress, except that in any action brought against a
> judicial officer for an act or omission taken in such
> officer's judicial capacity, injunctive relief shall
> not be granted unless a declaratory decree was
> violated or declaratory relief was unavailable. For
> the purposes of this section, any Act of Congress
> applicable exclusively to the District of Columbia

**17**

shall be considered to be a statute of the District
of Columbia.

### D.    Fourth Amendment

Under the Fourth Amendment the right of the people to be
secure in their persons, houses, and effects, against
unreasonable searches and seizures, shall not be violated.  U.S.
Const. amend. IV.; *Menotti v. City of Seattle,* 409 F. 3d 1113,
1152 (9th Cir. 2005).  The Supreme Court has held that "in the
ordinary case, seizures of personal property are unreasonable
within the meaning of the Fourth Amendment, without more, unless
accomplished pursuant to a judicial warrant issued by a neutral
and detached magistrate after finding probable cause.  *Id.*
However, when faced with special law enforcement needs, the
Supreme Court has found that certain general, or individual,
circumstances may render a warrantless search or seizure
reasonable.  *Id.*

### E.    The *Monell* Doctrine

Local governments[1] are "persons" subject to suit for
"constitutional tort[s]" under 42 U.S.C. § 1983.[2]  *Haugen v.*

---

[1] Although *Monell* dealt with a municipal government's
liability under § 1983, the standard there announced was
more broadly framed in terms of "a local government."  *Brass
v. County of L.A.*, 328 F.3d 1192, 1198 (9th Cir. 2003).

[2] "There is certainly no constitutional impediment to
municipal liability.  'The Tenth Amendment's reservation of
nondelegated powers to the States is not implicated by a
federal-court judgment enforcing the express prohibitions of
unlawful state conduct enacted by the Fourteenth
Amendment.'"  *Monell*, 436 U.S. 691 (quoting *Milliken v.*

**18**

*Brosseau*, 339 F.3d 857, 874 (9th Cir. 2003) (citing *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 691 n.55 (1978)) (also finding the fact that "local governments can be sued under § 1983 necessarily decides that local government officials sued in their official capacities are "persons" under § 1983 in those cases in which, as here, a local government would be suable in its own name").  "[T]he legislative history of the Civil Rights Act of 1871 compels the conclusion that Congress did intend municipalities and other local government units to be included among those persons to whom § 1983 applies." *Id.* at 690.  "Local governing bodies, therefore, can be sued directly under § 1983 for monetary, declaratory, or injunctive relief where, as here, the action that is alleged to be unconstitutional implements or executes a policy statement, ordinance, regulation, or decision officially adopted and promulgated by that body's officers...[or for] deprivations visited pursuant to governmental 'custom' even though such a custom has not received formal approval through the body's official decision making channels."[3]  *Id.* 690-91.

_____

*Bradley*, 433 U.S. 267, 291 (1977)).  There is no "basis for concluding that the Eleventh Amendment is a bar to municipal liability." *Id.* (citing *Fitzpatrick v. Bitzer*, 427 U.S. 445, 456 (1976); *Lincoln County v. Luning*, 133 U.S. 529, 530 (1890)).

[3] In *Brass v. County of Los Angeles*, the Ninth Circuit followed evolution of municipal liability from *Monroe* to *Monell*:

> In *Monroe v. Pape*, 365 U.S. 167 [](1961), the Supreme Court held that municipal corporations

**19**

A local government's liability is limited.  Although a local government can be held liable for its official policies or customs, it will not be held liable for an employee's actions outside of the scope of these policies or customs.  "[T]he language of § 1983, read against the background of the same legislative history, compels the conclusion that Congress did not intend municipalities to be held liable unless action pursuant to official municipal policy of some nature caused a constitutional tort.  In particular,...a municipality cannot be held liable solely because it employs a tortfeasor, in other words, a municipality cannot be held liable under § 1983 on a respondeat superior theory."  *Monell*, 436 U.S. at 691.  The statute's "language plainly imposes liability on a government that, under

---

were not subject to liability under § 1983.  In *Monell*, 436 U.S. at 665, the Court, based upon its "fresh" review of the legislative history of the Civil Rights Act of 1871 (the statutory predecessor to § 1983), "overrule[d] *Monroe v. Pape*...insofar as it holds that local governments are wholly immune from suit under § 1983."  *Id*. at 663 (footnote omitted).  The Court, however, upheld *Monroe* "insofar as it holds that the doctrine of respondeat superior is not a basis for rendering municipalities liable under § 1983 for the constitutional torts of their employees."  *Id*. at 663 n.7. It stated that "the language of § 1983, read against the background of the same legislative history, compels the conclusion that Congress did not intend municipalities to be held liable unless action pursuant to official municipal policy of some nature caused a constitutional tort."  *Id*. at 691.

328 F.3d at 1198.

color of some official policy, [that] 'causes' an employee to

violate another's constitutional rights." *Id*. at 692.

Therefore, "a local government may not be sued under § 1983 for

an injury inflicted solely by its employees or agents.  Instead,

it is when execution of a government's policy or custom, whether

made by its law-makers or by those whose edicts or acts may

fairly be said to represent official policy, inflicts the injury

that the government as an entity is responsible under § 1983."

*Id*. at 694.

## F.    Suits Against Government Officials: Official Capacity and Individual Capacity Suits

"1983 claims against government officials in their official

capacities are really suits against the governmental employer

because the employer must pay any damages awarded." *Butler v.*

*Elle*, 281 F.3d 1014, 1023 (9th Cir. 2002) (citing *Ky. v. Graham*,

473 U.S. 159, 165-66 (1985)); *see also Doe v. Lawrence Livermore*

*Nat'l Lab.*, 131 F.3d 836, 839 (9th Cir. 1997) (finding that "a

suit against a state official in his official capacity is no

different from a suit against the [official's office or the]

State itself")(citing *Will v. Mich. Dep't of State Police*, 491

U.S. 58, 70-71 (1989).  In such suits, the real party in interest

is the entity for which the official works. *Hafer v. Melo,* 502

U.S. 21, 25 (1991).  A federal action for monetary damages

against an individual state official acting in his official

**21**

capacity is barred by the Eleventh Amendment in the same way that an action against a State is barred. *Doe v. Lawrence Livermore Nat'l Lab.,* 131 F.3d 836, 839 (9th Cir. 1997). "As the Supreme Court has stated, 'official-capacity suits...generally represent only another way of pleading an action against an entity of which an officer is an agent.'" *Ruvalcaba v. City of Los Angeles*, 167 F.3d 514, 524 n.3 (9th Cir. 1999) (quoting *Graham*, 473 U.S. at 165). "'As long as the government entity receives notice and an opportunity to respond, an official-capacity suit is, in all respects other than name, to be treated as a suit against the entity.'" *Ruvalcaba*, 167 F.3d at 524 n.3 (quoting *Graham*, 473 U.S. at 166.)

By contrast, "[p]ersonal-capacity suits seek to impose personal liability upon a government official for actions [taken] under color of state law." *Dittman v. California*, 191 F.3d 1020, 1027 (9th Cir. 1999)(*citing Kentucky v. Graham*, 473 U.S. 159, 165 (1985))(internal quotations omitted). To establish personal liability in a §1983 or §1985 action, it is enough to show that the official, "acting under color of state law, caused the deprivation of a federal right." *Hafer,* 502 U.S. at 25 (internal quotations omitted). Public officials sued in their personal capacity may assert personal liability defenses, such as qualified immunity. *Dittman,* 191 F.3d at 1027.

**22**

1   Plaintiff does not indicate whether he is suing Defendants

2   in their official capacity, individual capacity, or both.

3   Plaintiff names Chief Dyer as a Defendant in this case even

4   though there is nothing in the record to indicate that Chief Dyer

5   was present at the residence on the evening of March 5, 2005.  It

6   appears that Plaintiff is suing Chief Dyer only in his official

7   capacity.  Plaintiff appears to be suing Manfredi and Tafoya in

8   their individual capacities.

9

10              **5.  <u>DISCUSSION</u>**

11   **A.   Qualified Immunity of Officers Tafoya and Manfredi**

12   Defendants assert that Plaintiffs have failed to overcome

13   qualified immunity.  Qualified immunity grows out of the policy

14   concern that few individuals would enter public service if they

15   risked personal liability for their official decisions.  *Harlow*

16   *v. Fitzgerald*, 457 U.S. 800, 814 (1982).  The immunity protects

17   "all but the plainly incompetent or those who knowingly violate

18   the law," *Hunter v. Bryant*, 502 U.S. 224, 228 (1991), and

19   "spare[s] a defendant not only unwarranted liability, but

20   unwarranted demands customarily imposed upon those defending a

21   long drawn out lawsuit." *Siegert v. Gilley*, 500 U.S. 226, 232

22   (1991).  Qualified immunity is not a defense on the merits; it is

23   an "entitlement not to stand trial or face the burdens of

24   litigation" that may be overcome only by a showing that (1) a

25   constitutional right was in fact violated and (2) no reasonable

**23**

officer could believe defendant's actions were lawful in the context of fact-specific, analogous precedents. *Saucier v. Katz*, 533 U.S. 194, 200-202 (2001).

Here, Plaintiff alleges that Manfredi and Tafoya violated his Fourth Amendment rights based on their alleged use of excessive force, their illegal entry into the residence, and his false arrest. Merging the Fourth Amendment standard with the qualified immunity presumption results in a two step inquiry in which Plaintiff must establish that (1) the officers in fact lacked probable cause to believe that there was a threat and (2) that it would have been clear to a reasonable officer, confronting the same circumstances, that the actions of Tafoya and Manfredi were unlawful. *See Saucier,* 533 U.S. at 202.

### 1.   Excessive Force

#### a.   Constitutional Violation

The initial question under *Saucier* is whether there was any type or amount of force inflicted on Plaintiff as a result of Defendants' response to the incident on March 5, 2005.

In his complaint, Plaintiff alleges that Defendants used excessive force in seizing and arresting him which resulted in various injuries being sustained. (05-CV-00661, Doc. 29, FAC, Filed August 29, 2005.) However, Plaintiff fails to provide any facts to show that he sustained any injuries as a result of Defendants' response to the events at the residence or as a

**24**

result of his arrest.  Defendants contend that Tafoya saw Plaintiff and Lawrence Rendon inside the house and advised them that they were in custody and to get on the ground.  (DSUF, No. 65)  Plaintiff describes his encounter with Tafoya on March 5, 2005 as follows: "Tafoya walked in the house, struck Lawrence Rendon, then gave a command 'get down.'  Tafoya then proceeded to strike Gabriel and Rebecca Rodriguez in a violent manner with his expandable baton."  (Claudia Rendon Depo., 61:7-18.)  Plaintiff David Rendon, however, provides no facts to show that Tafoya or any other officer inflicted bodily harm on his person.  Plaintiff also fails to show any other type or amount of force was inflicted on him.  Plaintiff admits that upon his arrest he was asked by a police officer to stand up, and he was escorted out of the house without handcuffs, or any sort of control hold.  (DSUF, No. 77.)  Plaintiff admits to being handcuffed by a female officer outside of the residence.  (DSUF, No. 78.)  Plaintiff did not identify any treatment by this officer that he found objectionable other than her checking him for tattoos.  (DSUF, No. 79.)  Plaintiff then admits he was placed in the patrol vehicle without incident.  (DSUF, No. 80.) Ultimately, Plaintiff alleges excessive force against people other than himself.

Fourth Amendment rights are personal rights which may not be vicariously asserted. *United States v. Pulliam,* 405 F.3d 782, 789 (9th Cir. 2005); *see also, United States v. 100,348.00 in*

*United States Currency,* 354 F.3d 1110, 1125 (9th Cir. 2004).  The constitutional doctrine of standing guarantees that only those people whose rights are violated may sue for their restoration. *100,348.00 in United States Currency*, 354 F.3d 1110, 1125 (citing, *Schlesinger v. Reservists Comm. to Stop the War,* 418 U.S. 208, 221 (1974)) (standing requires that the complaining party suffer a particular injury caused by the action challenged as unlawful.)

Based on the facts viewed in light most favorable to Plaintiff, the nature and quality of the alleged intrusions surrounding his arrest, if any, were minimal.  There are no facts to show that Plaintiff's right to be free from excessive force was violated.  There is no basis upon which to find Defendants liable for the alleged use of excessive force.

Defendants Motion for Summary Judgment as to Plaintiff David Rendon's excessive force claim is **GRANTED.**

### b.    Reasonableness

In determining the reasonableness of a seizure effected by non-deadly force, we balance the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing government interests at stake.  *Miller v. Clark County*, 340 F.3d 959, 964 (9th Cir. 2003)(internal quotations omitted).  The analysis proceeds in three steps.  *Id.* First, an assessment is made into the gravity of the particular

**26**

intrusion on Fourth Amendment interests by evaluating the type and amount of force inflicted. *Id.* Second, we assess the importance of the government interest at stake by evaluating: (1) the severity of the crime at issue, (2) whether the suspect posed an immediate threat to the safety of the officers or others, and (3) whether the suspect was actively resisting arrest or attempting to evade arrest by flight. *Id.* Third, the gravity of the intrusion on the individual is balanced against the government's need for the intrusion to determine whether it was constitutionally reasonable. *Id.*

In addition, consideration of reasonableness must embody allowance for the fact that police officers are often forced to make split second judgments in circumstances that are tense, uncertain, and rapidly evolving about the amount of force that is necessary in a particular situation. *Jackson v. City of Bremerton,* 268 F.3d 646, 651 (9th Cir. 2001).

### 2.   Unlawful Entry

It is a basic principle of Fourth Amendment law that searches and seizures inside a home without a warrant are presumptively unreasonable. *Brigham City v. Stuart,* 126 S. Ct. 1943, 1947 (2006) (citing, *Groh v. Ramirez*, 540 U.S. 551, 559 (2004)). Nevertheless because the ultimate touchstone of the Fourth Amendment is reasonableness, the warrant requirement is subject to certain exceptions. *Id.* (citing, *Flippo v. West*

**27**

*Virginia,* 528 U.S. 11, 13 (1999)).  Some specific instances where law enforcement officers may make a warrantless entry onto private property are to fight a fire and investigate its cause, to prevent the imminent destruction of evidence, or to engage in hot pursuit of a fleeing suspect.  *Id.* (internal citations omitted).  The Ninth Circuit recognizes two general exceptions to the warrant requirement.  *United States v. Martinez*, 406 F.3d 1160, 1164 (9th Cir. 2005).  Under the exigency doctrine, entry into a home is permitted if (1) there is probable cause and (2) exigent circumstances exits.  *see, Id.*  Exigent circumstances are those circumstances that would cause a reasonable person to believe that entry was necessary to prevent physical harm to the officers or other persons, the destruction of relevant evidence, the escape of the suspect, or some other consequence improperly frustrating legitimate law enforcement efforts.  *Id.* (internal quotations omitted).  One exigency obviating the requirement of a warrant is the need to assist persons who are seriously injured or threatened with such injury.  *Stuart*, 126 S. Ct. at 1947.  The need to protect or preserve life or avoid serious injury is justification for what would be otherwise illegal absent an exigency or emergency.  *Id.*  Accordingly, law enforcement officers may enter a home without a warrant to render emergency assistance to an injured occupant or to protect an occupant from imminent injury.  *Id.*  It would be silly to suggest that the

**28**

police would commit a tort by entering to determine whether violence (or threat of violence) has just occurred or is about to (or soon will) occur. *Id.*

Alternately, the emergency exception to the warrant requirement contains three requirements:

>   (1)   The police must have reasonable grounds
>         to believe that there is an emergency at
>         hand and an immediate need for their
>         assistance for the protection for life
>         or property
>
>   (2)   The search must not be primarily
>         motivating by intent to arrest and seize
>         evidence
>
>   (3)   There must be some reasonable basis,
>         approximating probable cause, to
>         associate the emergency with the area or
>         place to be searched.

*Id.*

>   **a.   Constitutional Violation under *Saucier*: Did
>         Defendants Have Probable Cause to Believe
>         There was a Threat of Harm Inside The
>         Residence?**

It is undisputed that during the party a violent confrontation between two men took place in front of the residence. (DSUF, No. 5.) During this confrontation, Chris Martinez punched Rudy Escobar in the face. (DSUF, No. 6.) The undisputed facts show that there was alcohol involved and that Ralph Rendon had "had too much to drink". (DSUF, No. 10.) A "mob of people" had gathered in the front yard area, and people were shouting to the point where Plaintiff "couldn't hear anything." (DSUF, No. 12.)

At approximately midnight on March 5, 2005 Manfredi and
Tafoya received a disturbance call concerning a fight described
as involving 50 people at the residence.  (DSUF, No. 21.)  Upon
arrival Manfredi saw a "big disturbance".  (DSUF, No. 31.)  There
were approximately 20-25 persons involved in a melee.  (*Id.*)
Manfredi saw persons running away from the house, as well as
running toward the house.  (DSUF, No. 32.)  Manfredi saw that the
disturbance seemed to be primarily at the front door to the
residence.  (DSUF, No. 33.)  He saw several persons trying to
keep one group of people out of the house while trying to get
others into the house at the same time.  (*Id.*)  Officer Escareno
saw the disturbance from approximately 10-15 feet behind Manfredi
and Tafoya, and observed ladies crying and yelling in the front
of the residence.  (Escareno Depo, 25:1923; 31:20-24.)

There are no facts in dispute as to the existence of a
disturbance or that Manfredi and Tafoya got a call at midnight
regarding a disturbance at the residence.  Plaintiff also does
not dispute that there was yelling and crying during the
disturbance.  The undisputed facts viewed in the light most
favorable to the non moving party sufficiently show that Manfredi
and Tafoya had probable cause to believe there was a potential
threat or harm to the safety of the public and that crimes were
being committed in the officers' presence, such as disturbing the
peace, battery, fighting in public, public intoxication, and

1    others.

2              **b.    Could A Reasonable Officer Believe The**
3              **Circumstances At The Residence Were Exigent**
                **Circumstances Such That a Warrantless Entry**
4              **Was Necessary To Prevent a Harm or Threat**
                **Inside The Residence?**
5

6         It is critical to define the right allegedly violated with

7    the appropriate level of specificity when deciding whether it

8    would be "clear to a reasonable officer that his conduct was

9    unlawful in the situation he confronted." *Saucier*, 533 U.S. at

10   202.  If no reasonable officer would believe Manfredi or Tafoya's

11
     actions were lawful under the circumstances, they are not
12
     entitled to qualified immunity as a matter of law.  The parties
13
14   and facts are in dispute as to the nature and gravity of the

15   surrounding circumstances and whether Defendants' actions were a

16   reasonable response.

17        As Manfredi and Tafoya exited the patrol vehicle, Manfredi
18
     placed a Code 3 call from his lapel microphone because of the
19
20   size of the disturbance.  (DSUF, No. 30.)  Defendants claim that

21   there was fighting in the yard and the porch, with lawn chairs

22   and beer bottles being thrown across the yard.  (DSUF, No. 31.)

23   Plaintiff disputes that the 20-25 people in the front yard of the

24   residence were engaged in a fight.  (Escareno Depo, 20:6-13;

25   23:5-21; 25:12-23.)  Plaintiff claims that the confrontation
26
     between Martinez and Escobar took place before police arrived on
27
28   the scene and that, by that time, Martinez had apologized to

**31**

Escobar for hitting him.  (Plaintiffs Depo., 175:18-177:17,
181:13-182:3, and 213:15-214:9; Escareno Depo., 23:5-21.)

    Manfredi considered the possibility that a gang was trying
to crash the party because the area was dominated by the
"Bulldogs," a local gang.  (DSUF, No. 34.)  However, Plaintiff
claims that Manfredi had no reason to believe that the people he
was dealing with were "Gang Related," or that it was a "Gang
Party."  (Manfredi Depo, 41:12-23.)  This dispute however is
immaterial as the officers recognized the residence as being
Bulldog gang territory.  Manfredi considered the circumstances he
faced to be dangerous.  (DSUF, No. 36.)  However, according to
Plaintiff, Officer Escareno did not see any immediate threat upon
arriving.  (Escareno Depo., 59:1-4; 58:4-8.)

    The facts also show that there is a material dispute as to
whether a reasonable person would have believed Defendants'
warrantless entry was necessary to prevent the escape of a
suspect, for the prevention of harm to officers or others, for
emergency assistance, or for some other consequence frustrating a
legitimate law enforcement efforts.

                 i.    Officer Tafoya's Reasonable Belief

    Tafoya claims that while he was breaking up the altercation
on the porch of the residence he heard an individual yell out
"leave my family alone."  (DSUF, No. 52.)  Tafoya directed his
attention toward the direction of where he heard this voice and

32

an individual, later identified as Plaintiff, struck him in the face with a closed fist. (DSUF, No. 53.)  Officer Tafoya observed the person who hit him in the face, later identified as Plaintiff, flee inside the Rendon residence.  (DSUF, No. 54.) Defendants argue that Tafoya was also struck by Lawrence Rendon who lunged over people and hit Tafoya on top of his head with his left fist.  (DSUF, No. 56.)  Defendants claim that Lawrence Rendon fled inside the residence after Tafoya struck him with his expandable baton to keep from getting hit.  (DSUF. No 58.)

Plaintiff on the other hand claims that he never encountered or assaulted Tafoya outside the residence that night.  (Escareno Depo., 31:25-32:7; 32:25-33:9.)  Plaintiff also offers as evidence testimony from Officer Escareno that he did not see or otherwise observe any individuals at the residence hit or kick Manfredi or Tafoya.  (*Id.*)  Plaintiff also offers testimony from Claudia Rendon who stated that she and Plaintiff entered the home before the police arrived. (Claudia Rendon Depo., 57:12-21; 58:18-21.)   Plaintiff further disputes the fact that Lawrence Rendon was outside on the porch.  According to Plaintiff, Claudia Rendon observed Lawrence Rendon inside the living room standing next to the bookcase. (Claudia Rendon Depo., 61:7-18.) Plaintiff claims that he never struck Tafoya and walked inside the home with his wife Claudia Rendon prior to their arrival. (Claudia Rendon Depo., 57:12-21; 58:18-21; Escareno Depo., 31:25-

**33**

32:7; 32:25-33:9.)  Plaintiff also claims that Officer Escareno never observed any individual at the residence strike, kick, or be combative with the Defendant officers.  (*Id.*)

Lastly, Defendants claim that Tafoya was pushed and shoved toward the front door of the residence by a large group of unknown persons (DSUF, no. 59.)  Tafoya claims that he tried to get out of the way from this group but was unable to.  (DSUF, No. 60.)  However, Plaintiff claims that Tafoya "quickly walked" inside the residence swinging his baton seemingly upset, angry, and hostile.  (Claudia Rendon Depo., 61:7-18.)

Viewing these facts in a light most favorable to plaintiff who is the non-moving party, if no individual present was engaged in violence or offering a threat to the officers, no reasonable officer would have believed it was necessary to have used force and make arrests or enter the residence.  Tafoya is not entitled to qualified immunity as a matter of law.

### ii.  Sargent Manfredi's Reasonable Belief

The undisputed facts show that Manfredi and Tafoya arrived at the Rendon residence past midnight on March 5, 2005.  Prior to their arrival a physical confrontation had taken place between two guests at the party.  Upon arrival, Manfredi and Tafoya encounter a crowd of approximately 15-20 people gathered in the front yard.  Some guests at the party were drinking alcohol. Some of the guests were shouting.

**34**

1    While there is a dispute as to the reasonableness of Officer

2    Tafoya's entry into the residence, there is no dispute as to

3    Manfredi's reasonable belief that he faced exigent circumstances

4    such that his warrantless entry was necessary to prevent harm.

5    Defendants argue that, given the scene outside the residence upon

6    the officers' arrival, Manfredi was concerned for Tafoya's safety

7    

8    after Tafoya entered the residence.[4]  (DSUF, No. 69.)  Based on

9    this concern, Defendants argue that Manfredi instructed Officer

10   Escareno to find Tafoya.  (*Id.*)  At that point, Officer Escareno

11   and Officer Stockdale requested entry into the residence and were

12   allowed entry by Plaintiff's father.  (DSUF, No. 71.)  At oral

13   argument, Defendants further argued that Manfredi proceeded to

14   enter the residence out of continued concern for Tafoya.  (DSUF,

15   No. 75.)  Plaintiffs do not dispute these facts.  Further,

16   Plaintiff offers testimony by Officer Escareno that he too was

17   concerned that he did not see Tafoya outside the residence upon

18   his arrival.  (Escareno, Dep., 66:20-67:1-10.)

19   

20   Viewing these facts in a light most favorable to plaintiff

21   who is the non-moving party, if there had been an earlier

22   altercation at the residence, some guests were drinking alcohol,

23   some guests were shouting, and the officers were outnumbered by

24   guests in an area that is known to be Bulldog gang territory, it

25   was reasonable for Manfredi to enter the residence after Tafoya

26   

27   

28   [4] At oral argument on August 7, 2006 the parties agreed that
     Tafoya had entered the residence before Manfredi.

out of concern for Tafoya's safety.  Manfredi is entitled to qualified immunity as a matter of law.

### c.  Emergency Exception

#### i.  Did Defendants Have Reasonable Grounds to Believe That There Was An Emergency At Hand and An Immediate Need for Their Assistance?

The Ninth circuit has also applied an emergency exception to unlawful entry.  The parties dispute the nature of the circumstances Defendants were faced with on March 5, 2005. Defendants claim that there was fighting when they arrived and that they became involved in pulling people apart during that fighting outside of the residence.  Defendants claim that they believed a Gang could be involved in the altercation and that the situation they were faced with was dangerous.

Plaintiffs, on the other hand, maintain that by the time that the police arrived at the residence any altercation that may have occurred was over.  Plaintiffs also offer facts to show that there was no immediate threat to police officers upon arrival at the residence.

Defendants claim that as Manfredi and Tafoya were attempting to pull people apart during the fighting on the porch, Manfredi was struck by both Lawrence and Ralph Rendon who then fled into the house.  Tafoya claims that he was struck by Plaintiff who then fled inside the house.  Plaintiff, however, has testified that Manfredi and Tafoya were at no time assaulted by anyone at

the party and were never under any threat of immediate harm at
the party.

There is also a dispute between the parties as to whether an
emergency existed inside the residence on the night in question,
such that Manfredi and Tafoya had reasonable grounds to enter
without a warrant.  Defendants claim that Tafoya was pushed and
shoved toward the front door of the residence by a large group of
unknown persons.  (DSUF, No. 59.)  Tafoya tried to but was unable
to get out of the way of this group.  (DSUF, NO. 60.)  Plaintiff
disputes these facts and claims that Tafoya quickly walked inside
the residence swinging his baton seemingly upset, angry and
hostile.  (Claudia Rendon Depo., 61:7-18.)

Tafoya claims that he began to be struck by unknown subjects
in different locations and that at this point he was "scared to
death".  (DSUF, nos. 61-62.)  Tafoya noticed that the front door
was shut once he entered the residence.  (DSUF, No. 64.)  Tafoya
claims that at different intervals he was attacked, physically
and verbally, inside the residence by several persons including
David J. Rendon, Gabriel Rodriguez, Rebecca Rodriguez, and John
Nunez.  (DSUF, No. 67.)  Tafoya advised over his lapel microphone
that he needed Code 3 assistance inside the residence and then
proceeded to advise Plaintiff and Lawrence Rendon that they were
under arrest and to get on the ground.  (DSUF, No. 66.)

37

Plaintiff provides a different account of what occurred inside the residence.   Plaintiff claims that at no time was the front door shut, but only the screen door was shut.  (Plaintiff's Depo., 269:15-24; 270:3-8.)   Plaintiff also claims that upon walking inside the house, Tafoya struck Lawrence Rendon and gave a command to "get down."   Tafoya then proceeded to strike Gabriel and Rebecca Rodriguez in a violent manner with his expandable baton.  (Claudia Rendon Depo., 61:7-18.)   Plaintiff claims that at no point in time while inside the house Tafoya was physically attacked or was his life in danger.  (Escareno Depo., 197:21-197:1-11.)   Plaintiff further claims that Officer Escareno at one point approached Tafoya and asked him to exit the residence, as he had witnessed that people were fearful and upset by Tafoya's presence.  (Escareno Depo., 99:3-100:8-20.)

Viewing these facts in light most favorable to the non moving party, if the plaintiff's version of the events is accurate, no reasonable officer would have believed that the actions of Tafoya and Manfredi were lawful under the circumstances.   Qualified immunity cannot be decided as a matter of law.

> **ii.   Was The Search Primarily Motivated By an Intent to Make An Arrest and Seize Evidence?**

Apart from the officers' reasonable belief that an emergency required their intervention, it cannot be said that there is no

issue of material fact as to whether the entry was primarily motivated by an intent to make an arrest and seize evidence rather than individuals.  Defendants claim that after Manfredi exited the patrol vehicle, his main concern was for the people at the front door, who looked like they were trying to protect the front of the house.  (DSUF, No. 35.)  Plaintiff disputes this fact. Further, the facts viewed in light most favorable to the non moving party, established there was no altercation or circumstance that would require Tafoya or Manfredi's entry into the residence or their arrest of individuals inside the residence.  Nevertheless Tafoya walked toward the front door and directed officers to arrest Gabriel and Rebecca Rodriguez. (DSUF, No. 73.)  Plaintiffs claim that Tafoya escorted Gabriel Rendon outside the residence and that soon came back to the front of the house only to stop and assault an individual by kicking him. (Escareno Depo., 103:22-104:1-11; 107:10-20.)  Plaintiff's claim that with the help of another officer, Tafoya took this individual down to the ground and arrested him even though he was not combative, struggling, or fighting back.  (*Id.*)

     Defendants claim that outside of the residence Manfredi took control of Ralph Rendon and eventually handed him to Officer Chun.  (DSUF, No. 74.)  Plaintiff claims that Manfredi struck Ralph Rendon with the end of his revolver, while the suspect was

**39**

on the ground, handcuffed behind his back.  (Escareno Depo., 160:2-13, 161:22-162:1-11.)

Based on these facts it cannot be said that there are no issues of material fact that the entry into the residence was not primarily motivated by an intent to make an arrest without probable cause.

### iii.  Is There A Reasonable Basis For Probable Cause?

The undisputed facts show that Manfredi and Tafoya received a disturbance call at approximately midnight on March 5, 2005. Upon arrival Manfredi saw a large disturbance involving approximately 20-25 people outside the Rendon residence. Manfredi also saw persons running away from and toward the residence.  The disturbance was primarily located at the front door to the residence.  Manfredi saw several persons at the front door trying to keep one group of people out of the house while trying to get others into the house at the same time.  Officer Escareno saw the disturbance from approximately 10-15 feet behind Manfredi and Tafoya, and observed ladies crying and yelling in the front of the residence.  These facts create a dispute about the nature and intensity of the gathering in front of the residence and whether there was probable cause to enter the residence.

**40**

There are issues of material fact as to whether Tafoya had reasonable grounds to believe that his assistance was required under emergency conditions or that the arrest was not primarily motivated by an intent to make an arrest.  However, upon Tafoya's entry into the residence, it was reasonable that Manfredi be concerned about Tafoya's safety and enter the residence as a result of this concern.

Defendants' Motion for Summary Judgment as to Plaintiff's unlawful entry claim against Officer Tafoya is **DENIED.**

Defendants' Motion for Summary Judgment as to Plaintiff's unlawful entry claim against Sargent Manfredi is **GRANTED.**

### 3.   False Arrest

In the FAC Plaintiff claims that he was "deprived of his right to be secure in his person against unreasonable seizure in violation of the Fourth and Fourteenth Amendments of the Constitution.  (05-00661, Doc. 29, FAC. Filed August 29, 2005.) Defendant argues that the Court dismissed this claim pursuant to Defendants' first motion to dismiss.

According to a November 23, 2005 Order, Plaintiff appeared to "waive" any false arrest claim that might have been stated in the initial complaint.  (05-00661, Doc. 38, Order Re Defendants' Motion to Dismiss, Filed November 23, 2005 (citing to Doc. 22, Plaintiff's Opposition to Motion to Dismiss at 16, Filed July 21, 2005).)

**41**

In the November 23, 2005 Order, the court noted that Plaintiff stated in his opposition to the first motion to dismiss that he would "waive a 'false arrest' claim at this point, but will reserve that claim since Counsel has opened the door."  The court reasoned, however, that despite Plaintiff's stated intent to "reserve" the claim, he offered no legal or factual authority to oppose Defendants' motion to dismiss the false arrest claim. The court further reasoned that because Plaintiff made no attempt to re-plead any such claim in the first amended complaint, he is not entitled to bring up such a claim at the 12(b)(6) stage. (Doc. 38, Order at 2-3 n.2).[5]

**B.   Conspiracy Claim**

Plaintiff's third cause of action alleges a conspiracy between Tafoya and Manfredi to falsify their police reports. Plaintiff fails to specify what kind of conspiracy claim he is bringing.  To prove a conspiracy, Plaintiff must show "an agreement or 'meeting of the minds' to violate constitutional

---

[5] At oral argument on August 7, 2006 Plaintiff presented the court with a letter indicating that any criminal charges against him were dismissed.  Plaintiff argued that the dismissal of the criminal charges against him is evidence of that Defendant officers had no probable cause to arrest him.  Even if Plaintiff were to reallege a false arrest claim, the mere fact that charges were dismissed against him have no bearing on whether Defendant officers had probable cause to arrest him.  A probable cause inquiry involves a determination that the evidence available and known to the officers at the time of Plaintiffs arrest supported a reasonable belief that Plaintiff's conduct warranted the arrest.  *See, Haupt v. Dillard*, 17 F.3d 285, 289 (9th Cir. 1994.)

rights." *Franklin v. Fox*, 312 F.3d 423, 441 (9th Cir. 2002) (citations omitted).  Each individual does not need to know the plan; sharing the common purpose of the conspiracy is sufficient. *Id.*  A private individual may be liable if he conspired with a state actor.  *Id.* (internal citations omitted).

The elements of a civil conspiracy are (1) the formation and operation of a conspiracy, (2) wrongful conduct in furtherance of the conspiracy, and (3) damages arising from wrongful conduct. *Applied Equipment Corp. v. Litton Saudi Arabia Ltd.*, 7 Cal. 4th 503, 511 (Cal. 1994).  A conspiracy does not stand as an independent action, rather it is a legal doctrine to establish joint liability by the conspirators for the underlying tort.  *See Entm't Research Group v. Genesis Creative Group*, 122 F.3d 1211, 1228 (9th Cir. 1997) (*citing Applied Equipment Corp.*, 7 Cal. 4th at 511).  If a plaintiff fails to plead the underlying claim, the corresponding conspiracy claim must also fail.  *Id.* ("It is the acts done and not the conspiracy to do them which should be regarded as the essence of a civil action.") (internal citation omitted).

Plaintiff alleges in his FAC that Manfredi and Tafoya falsified their police reports in order to justify their unlawful acts and conduct.  (Doc. 29, FAC, Para. 36.)  Plaintiff claims that the alleged falsifications deprived him of his rights secured under the Fourth and Fourteenth Amendments of the

**43**

Constitution of the United States.  However, Plaintiff fails to

provide facts showing that Tafoya and Manfredi formed or operated

a conspiracy to falsify their police reports or violate

Plaintiff's constitutional rights.  Plaintiff also fails to

provide facts to show Manfredi engaged in wrongful conduct in

furtherance of the conspiracy.  Defendant claims that Manfredi

and Tafoya prepared their police reports independently and did

not conspire to falsify their police reports.  (DSUF, No. 81.)

However, Plaintiff disputes this fact.  Plaintiff offers

testimony claiming that Officer Escareno had a conversation with

Tafoya later that evening regarding Anaya writing an original

report about the incident of March 6, 2005 of which she had not

been a witness to and had "came after the fact."  (Escareno

Depo., 205:21-206:11.)

    Plaintiff's disputing the fact that Manfredi and Tafoya did

not conspire to falsify their police report coupled with his

claim that someone other than Manfredi or Tafoya apparently wrote

the report is insufficient to show a conspiracy.  Even if

Plaintiff were to show facts to support a conspiracy claim,

Plaintiff has not provided any facts for the underlying claim

that Tafoya and Manfredi falsified their reports.

    Plaintiff's conspiracy claim does not implicate 42 U.S.C. §

1985(3), conspiracy to interfere with civil rights.  Elements of

a 1985(3) claim are: (1) existence of a conspiracy to deprive

**44**

Plaintiff of equal protection under the law; (2) an act in furtherance of the conspiracy; and (3) a resulting injury. *Addisu v. Fred Meyer, Inc.*, 198 F.3d 1130, 1141 (9th Cir. 2000) (*citing Scott v. Ross*, 140 F.3d 1275, 1284 (9th Cir. 1998)).

An essential requirement for a 1985(3) claim is that there must be some racial or otherwise class-based "invidious discriminatory animus" for the conspiracy. *Bray v. Alexandria Women's Health Clinic*, 506 U.S. 263, 268-69 (1993) (*citing Griffin v. Breckenridge*, 403 U.S. 88, 102 (1971)). Section 1985(3) was not meant to apply to all tortious conspiracies to deprive the rights of another. *Id.* Section 1985(3) does not extend to classes beyond race unless that class can show that the government has determined that class members "require and warrant special federal assistance in protecting their civil rights." *Orin v. Barclay*, 272 F.3d 1207, 1217 n.4 (9th Cir. 2001).

Plaintiff does not satisfy a § 1985(3) action because he does not claim a racially-motivated animus, nor that he is a member of a class that requires special federal protection. He is a state corrections officer. Further, the facts do not allege the elements of a 1985(3) action, such as the existence of a conspiracy or acts in furtherance of a conspiracy. Consequently, a 1985(3) action does not apply.

//

//

**45**

**C.   Plaintiff's *Monell* Claim**

To prevail on a § 1983 complaint against a local government under *Monell*, a plaintiff must satisfy a three-part test:  (1) The official(s) must have violated the plaintiff's constitutional rights;[1] (2) The violation must be a part of policy or custom and may not be an isolated incident; and (3) A nexus must link the specific policy or custom to the plaintiff's injury.  *See Monell*, 436 U.S. at 690-92.  There are three ways to show a policy or custom of a municipality:

> (1)  By showing a longstanding practice or custom which constitutes the standard operating procedure of the local government entity;
>
> (2)  By showing that the decision-making official was, as a matter of state law, a final policymaking authority whose edicts or acts may fairly be said to represent official policy in the area of decision or
>
> (3)  By showing that an official with final policymaking authority either delegated that authority to, or ratified the decision of, a subordinate.

*Menotti v. City of Seattle*, 409 F.3d 1113, 1147 (9th Cir. 2005). A municipal policy may be inferred from widespread practices or

---

[1] "[A] public official is liable under § 1983 only if he causes the plaintiff to be subjected to deprivation of his constitutional rights.'" Brass, 328 F.3d at 1200 (quoting *Baker v. McCollan*, 443 U.S. 137, 142 (1979)(citation and internal quotation marks omitted)). "'Section 1983 imposes liability for violations of rights protected by the Constitution, not for violations of duties of care arising out of tort law." *Brass*, 328 F.3d at 1200 (quoting *Baker*, 443 U.S. at 146).

**46**

evidence of repeated constitutional violations for which the errant municipal officers were not discharged or reprimanded. *Id.*

Plaintiff argues that Defendants' alleged constitutional violations were according to official or tacitly approved policy, practice and custom of the City of Fresno.  (Doc. 29, FAC, ¶ 6.) Plaintiff further argues that Defendants City of Fresno and Chief Dyer negligently hired, trained, staffed, and supervised Defendant officers by failing to adequately and properly supervise, control, and discipline them in their duties to refrain from unlawfully and maliciously assaulting and injuring citizens and otherwise using unreasonable and excessive force before, during, and after making an arrest or seizure.  (*Id.* at ¶¶ 26-27.)

In support of his claims Plaintiff states that Manfredi has a history of using excessive and unnecessary force. (Escareno Depo., 160:2-13, 161:22-162:1-11.)  However, Plaintiff has not introduced evidence creating a material issue of fact as to whether the Defendant officers were acting pursuant to a municipal policy or custom.  Plaintiff alleges that Defendants have an excessive history of complaints, shootings, and lawsuits alleging civil rights violations and the use of excessive force. However, Plaintiff provides no facts in his declaration to support this allegation.  Plaintiff also provides no facts to

**47**

show that his alleged constitutional violation was part of a policy or custom of the City of Fresno.  Plaintiff provides no other evidence in the form of affidavits or testimony that establishes any of the following: (1) a longstanding practice or custom by the City of Fresno constituting a standard operating procedure to hire and keep "rogue cops" (2) that the Defendant Officers' acts were, as a matter of state law, representative of the City of Fresno's official policy, or (3) that the alleged violation of his alleged constitutional right was the result of the City of Fresno or Chief Dyer delegating their authority to or ratifying the actions of the Defendant Officers present at the residence on March 5, 2005.

Based on the total evidence in the record, and viewing the evidence in the light most favorable to Plaintiff, there are no material issues concerning the adequacy of training, hiring, and supervisory measures by the City of Fresno.

Defendants' motion for summary judgment as to Plaintiff's *Monell* claim is **GRANTED.**

### D.   State Law Claims

#### 1.   Supplemental Jurisdiction Under 1367(a)

Title 28 U.S.C. section 1367(a) provides in pertinent part:

> "In any civil action of which the district courts have original jurisdiction, the district court shall have supplemental jurisdiction over all other claims that are so related to the claims in the action within such original jurisdiction that they form part of the same

**48**

1    case or controversy under Article III of the United
2    States Constitution."

3        Plaintiff alleges a § 1983 claim for Fourth Amendment
4    violations.  Plaintiff's state law claims invoke supplemental
5    jurisdiction and arise from the same controversy as his §1983
6    claim.

### 2.   California Tort Claims Act

9        In California, a person making a claim against a public
10   entity or a public employee must present such a claim in writing
11   to the clerk, auditor or secretary of the local public entity
12   within six months after the accrual of the cause of action.  Cal.
13   Gov. Code § 911.2.; see also *Javor v. Taggart*, 98 Cal. App. 4th
14   795, 804 (Cal. Ct. App. 2002) (submission of a claim to a public
15   entity pursuant to the California Tort Claims Act is a condition
16   precedent to a civil action against the state or its employees
17   and failure to present the claim bars the action.)  A person may
18   not maintain a cause of action against a public entity or public
19   employee without having first presented a claim as required by
20   California Statute.  Cal. Gov. Code 945.4.  Cal. Gov. Code
21   section 954.6 requires that a claimant file a civil action within
22   six months after the public agency issues its decision.  *Javor*,
23   98 Cal. App. 4th at 804.
24

26       Defendants argue that Plaintiff never filed a claim for
27   damages pursuant to the California Tort Claims Act.  (DSUF, No.
28   82.)  Plaintiff argues in his opposition that he filed a

**49**

"Citizens Complaint" pursuant to § 832 of the California Penal Code with the City of Fresno.  However, the provisions of Cal. Pen. Code § 832 address Training Course Requirements for Peace Officers and make no mention of any requirements for a "citizen's complaint" or any grievance filing requirements under Cal. Gov. Code § 945.2.

Summary judgment is **GRANTED** in favor of Defendants.

### 3.   California Constitution §§ 7 and 13

Article I, § 7 of the California Constitution provides: "A person may not be deprived of life, liberty, or property without due process of law or denied equal protection of the laws."

Article I, § 13 of the California Constitution provides: "The right of the people to be secure in their persons, houses, papers, and effects against unreasonable seizures and searches may not be violated; and a warrant may not issue except on probable cause, supported by oath or affirmation, particularly describing the place to be searched and the persons and things to be seized."

Defendants argue that Plaintiff's may not bring a damages claim directly under §§ 7 and 13 of the California Constitution because alternative statutory and/or common law causes of action are available to redress Plaintiff's grievance.  In support of their proposition, Defendant cite to *Katzberg v. Regents of the*

**50**

*University of California*, 29 Cal. 4th 300, 303 (2002).   In

*Katzberg,* the issue was whether an individual may bring an action

for money damages on the basis of an alleged violation of the

California Constitution in the absence of a statutory provision

or an established common law tort authorizing such a damage

remedy for constitutional violation.[3]   *Katzberg,* 29 Cal. 4th at

303.   According to *Katzberg*, Plaintiff cannot bring a damages

claim under §§ 7 or 13 of the California Constitution, in part

because alternative statutory and/or common law causes of action

are available to redress his grievance.   *See, Katzberg*, 29 Cal.

4th at 303.; *see also, Rendon v. City of Fresno,* 2005 U.S. Dist.

Lexis 31623 (E.D. Cal. 2005).

     Summary judgment is **GRANTED.**

### 4.   Cal. Civ. Code §§ 52 and 52.1

     Cal. Civ. Code § 52 sets forth a damages remedy for civil

rights violations under California Law.   *Koebke v. Bernardo*

*Heights Country Club*, 36 Cal. 4th 824, 836 (Cal. 2004).   Cal.

Civ. Code § 52.1(a) provides that if a person interferes, or

attempts to interfere, by threats, intimidation, or coercion,

with the exercise or enjoyment of the constitutional or statutory

---

     [3] In *Katzberg,* Plaintiff sought monetary damages based on
Defendant's alleged violation of his due process liberty interest
under article I, section 7 of the California Constitution by
failing to provide him with a timely "name-clearing" hearing
after his removal as department chairman at a university medical
center.   The court concluded that an action for damages is not
available.   *Katzberg*, 29 Cal. 4th at 303.

rights of an individual or individuals, a civil action may be brought for equitable or injunctive relief. *Venegas v. County of Los Angeles*, 32 Cal. 4th 820, 841 (Cal. 2004). Cal. Civ. Code § 52.1(b) allows any individual so interfered with to sue for damages. Id. Cal. Civ. Code § 52.1(g) states that an action brought under § 52.1 is independent of any other action, remedy or procedure and may be available to an aggrieved individual under any other provision of law. *Id.*

Defendants claim that the undisputed material facts demonstrate Plaintiff lacks the evidence to maintain any constitutional claims under Cal. Civ. Code §§ 52 and 52.1. However a genuine issue of material fact exists regarding Plaintiff's unlawful entry claim in violation of his Fourth Amendment Rights.

Defendants motion for summary judgment as to Plaintiffs claims under Cal. Civ. Code §§ 52 and 52.1 is **DENIED.**

### 5.   Cal Penal Code §§ 118(a) and 181

Cal. Penal Code § 118 provides the definition of perjury under California law:

> "Every person who, having taken an oath that he or she will testify, declare, depose, or certify truly before any competent tribunal, officer, or person, in any of the cases in which the oath may be law of the State of California be administered, willfully and contrary to the oath, states as true any material matter which he or she knows to be false and every person who testifies, declares deposes, or certifies under penalty

**52**

of perjury and willfully states as true any
material matter which he or she knows to be
false is guilty of perjury."

Cal. Penal Code § 181 addresses the infringement of personal

liberty or attempt to assume ownership of persons under

California criminal law.  Cal. Penal Code § 181 provides:

> Every person who holds, or attempts to hold,
> any person in involuntary servitude, or
> assumes or attempts to assume, rights of
> ownership over any person, or who sells or
> attempts to sell, any person to another, or
> receives money or anything of value, in
> consideration of placing any person in the
> custody, or under the power or control of
> another, or who buys, or attempts to buy, any
> person, or pays money, or delivers anything
> of value, to another, in consideration of
> having any person placed in his custody, or
> under his power or control, or who knowingly
> aids or assists in any manner any one thus
> offending, is punishable by imprisonment in
> the state prison for two, three or four
> years.

No private right of action may be asserted for violation of

these criminal laws.  Defendants' motion for summary judgment is

**GRANTED** as to these claims.

### 6.CONCLUSION

For the reasons set forth above, Defendants' motion for

summary judgment is **GRANTED IN PART AND DENIED IN PART**.

• As to Plaintiff's Fourth Amendment claim for excessive use

  of force, summary judgment is **GRANTED**.

53

- As to the Plaintiff's Fourth Amendment claim for unlawful entry against Defendants, summary judgment is **DENIED AGAINST OFFICER TAFOYA**, and **GRANTED FOR SARGENT MANFREDI.**
- As to Plaintiff's claim for conspiracy, summary judgment is **GRANTED.**
- As to Plaintiff's claim for *Monell* liability, summary judgment is **GRANTED.**
- As to Plaintiff's state law claims under the California Tort Claims Act, summary judgment is **GRANTED.**
- As to Plaintiff's claim under California Constitution, Article I, sections 7 and 13 summary judgment is **DENIED.**
- As to Plaintiff's claim under Cal. Civ. Code §§ 52 and 52.1 is summary judgment is **DENIED.**
- As to Plaintiff's claim under Cal Penal Code §§ 118 (a) and 181 summary judgment is **GRANTED.**

**SO ORDERED**

Dated: September 18, 2006      /s/ OLIVER W. WANGER
                              **OLIVER W. WANGER**
                          **United States District Judge**

**54**